UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- X

In re MARK IV INDUSTRIES, INC., et
al.,

        Debtors.

_____

MARK IV INDUSTRIES, INC.,

          Plaintiff-Appellant,

  - against -

NEW MEXICO ENVIRONMENT
DEPARTMENT,

         Defendant-Appellee,

  - and -

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY, and CHANT
FAMILY II LIMITED PARTNERSHIP,

         Intervenor-Appellees.

_____

-------------------------------------------------- X

**OPINION AND ORDER**

**11 CIV 648 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _____9/28/11_____

SHIRA A. SCHEINDLIN, U.S.D.J.:

I.      INTRODUCTION

      Mark IV Industries, Inc. ("Mark IV") brought this adversary action

against the New Mexico Environment Department ("NMED") seeking a

declaratory judgment that its obligation to clean up a contaminated site was discharged in bankruptcy. The United States Environmental Protection Agency ("EPA") and Chant Family II Limited Partnership ("Chant") intervened. On cross-motions for summary judgment, the Bankruptcy Court for the Southern District of New York ("Bankruptcy Court") granted NMED's summary judgment motion and denied Mark IV's summary judgment motion. Mark IV appeals the Final Order and Judgment of the Bankruptcy Court. This Court has jurisdiction pursuant to section 158(a)(1) of Title 28 of the United States Code. For the reasons set forth below, the decision of the Bankruptcy Court is affirmed.

## II.    BACKGROUND

### A.    Ownership of and Operations at the Site

From approximately 1956 until 1979, Gulton Industries, Inc. ("Gulton") operated a facility that manufactured electronic circuit boards at 14800 Central Avenue, SE, Albuquerque, New Mexico (the "Site").[1] Gulton's operations involved etching metal wafer boards using caustic chemicals and rinsing the boards with a mixture of chlorinated solvents and water.[2] Gulton discharged rinse water

---

[1]    *See* Stipulation of Facts Filed by Mark IV Industries in Support of Its Motion for Summary Judgment ("Stipulation of Facts") ¶¶ 1-2, Ex. 14 to the Record.

[2]    *See id.* ¶¶ 3-4.

into a septic tank and leach field and later through unlined evaporation lagoons.[3]

On August 11, 1978, Gulton sold the Site to the Chant Corporation.[4] Gulton continued to operate the Site through 1979 pursuant to a leaseback agreement.[5]  By late 1979, Gulton ceased operations and vacated the Site.[6]  Mark IV acquired Gulton in 1987.[7]  Chant, a successor to Chant Corporation, is the current owner of the Site.[8]

### B.   Environmental Investigations and Cleanup Efforts at the Site

Beginning in 1990, NMED began investigating the Site.  These investigations revealed chlorinated volatile organic compounds ("VOCs") in the groundwater beneath the Site.  The VOC levels exceeded state groundwater quality standards and federal and state drinking water standards.[9]  According to NMED, the contamination extended a quarter of a mile from the Site, under neighboring

---

[3]      *See id.* ¶ 5.

[4]      *See id.* ¶ 6.

[5]      *See id.* ¶ 8.

[6]      *See id.* ¶ 9.

[7]      *See id.* ¶ 10.

[8]      *See id.* ¶ 7.

[9]      *See id.* ¶ 11.

properties.[10]  NMED's investigations also revealed elevated levels of cadmium, chromium, copper, and lead in surface soils at the Site.[11]

In 1995, Mark IV implemented a remediation plan, pursuant to which it removed the septic tank, leach field, evaporation lagoons, and approximately 1600 cubic yards of soil.[12]  After Mark IV implemented the remediation plan, VOCs remained in the groundwater in amounts exceeding federal and state drinking water standards.[13]  NMED contends that the VOCs are probably trapped in fractures in the bedrock beneath the Site.[14]

In November 1996, Mark IV voluntarily submitted a Stage 1 abatement plan to NMED pursuant to the New Mexico Water Quality Act ("Water Quality Act").[15]  Pursuant to the Stage 1 plan, Mark IV investigated the location

---

[10]     *See* 2/5/10 Affidavit of William Olson, Bureau Chief of the Ground Water Quality Bureau of NMED ("Feb. Olson Aff.") ¶ 13, Ex. 10 to the Record.

[11]     *See* Stipulation of Facts ¶ 11.

[12]     *See id.* ¶ 15.

[13]     *See id.*

[14]     *See* 3/5/10 Affidavit of William Olson, Bureau Chief of the Ground Water Quality Bureau of NMED ("Mar. Olson Aff.") ¶ 12, Ex. 22 to the Record.

[15]     *See* Stipulation of Facts ¶ 16.  For a discussion of the Water Quality Act, *see infra* Section III.B.1.

and extent of groundwater contamination at the Site.[16]  In September 2007, Mark

IV submitted a Stage 2 abatement plan at NMED's request.  NMED approved the

Stage 2 plan in March 2008.[17]  The Stage 2 plan required Mark IV to clean up the

groundwater using a hydrogen releasing compound injection process, which Mark

IV had tested in a pilot study a couple years earlier.[18]  After December 2008, Mark

IV ceased cleanup efforts.[19]  NMED claims that a plume of contaminants is

spreading and that the plume could move quickly in an unpredictable path due to

the fractured granite bedrock.[20]

###    C.    Mark IV's Bankruptcy Proceedings

On April 30, 2009, Mark IV filed a petition under Chapter 11 of the

Bankruptcy Code.[21]  In May 2009, Mark IV informed NMED and Chant that it

would stop complying with the terms of the Stage 2 abatement plan because of the

bankruptcy filing.[22]  On July 30, 2009, Mark IV and its affiliates filed a

---

[16]      *See id.*

[17]      *See id.* ¶¶ 21-22.

[18]      *See id.* ¶¶ 18, 21.

[19]      *See id.* ¶ 24.

[20]      *See* Feb. Olson Aff. ¶¶ 30, 34.

[21]      *See* Stipulation of Facts ¶ 26.

[22]      *See id.* ¶ 27.

reorganization plan, which the Bankruptcy Court confirmed on September 23, 2009, effective November 13, 2009.[23]

On October 30, 2009, Mark IV initiated this adversary proceeding against NMED by filing a complaint seeking a declaratory judgment that Mark IV's liability to NMED for contamination at the Site is a dischargeable claim under the Bankruptcy Code.[24]  On November 12, 2009, NMED responded with an answer and counterclaim seeking a declaratory judgment that its action for injunctive relief requiring Mark IV to abate groundwater pollution beneath and from the Site is not dischargeable.[25]  In January 2010, EPA and Chant intervened in support of NMED.[26]  After Mark IV and NMED moved for summary judgment, the Bankruptcy Court issued a memorandum decision on October 29, 2010 granting NMED's motion and denying Mark IV's motion.[27]  On December 6, 2010, the Bankruptcy Court entered an order and final judgment.[28]

---

[23]     *See id.* ¶ 29.

[24]     *See* Complaint against NMED Filed by Mark IV, Ex. 1 to the Record.

[25]     *See* Answer to Complaint & Counterclaim against Mark IV Filed by NMED, Ex. 3 to the Record.

[26]     *See* Stipulation and Order Permitting The United States and Chant Family II Limited Partnership to Intervene, Ex. 6 to the Record.

[27]     *See In re Mark IV Indus.*, 438 B.R. 460 (S.D.N.Y. 2010).

[28]     *See* Exs. 30, 31 to the Record.

## III.   LEGAL STANDARDS

### A.   Bankruptcy Appeals

A district court functions as an appellate court in reviewing judgments rendered by bankruptcy courts.[29]  Findings of fact are reviewed for clear error[30] whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[31]

### B.   Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[32]  "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit  under the governing law.'"[33]

---

[29]   *See In re Sanshoe Worldwide Corp.*, 993 F.2d 300, 305 (2d Cir. 1993).

[30]   *See* Fed. R. Bankr. P. 8013 ("Findings of fact . . . shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.").  *Accord In re Cody, Inc.*, 338 F.3d 89, 94 (2d Cir. 2003).

[31]   *See In re Adelphia Commc'ns Corp.*, 298 B.R. 49, 52 (S.D.N.Y. 2003) (citing *In re United States Lines, Inc.*, 197 F.3d 631, 640-41 (2d Cir. 1999)).

[32]   Fed. R. Civ. P. 56(a).

[33]   *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[34] "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[35] In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact. To do so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material facts,'"[36] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[37]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[38] However,

---

[34]     *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[35]     *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

[36]     *Brown v. Eli Lilly & Co.*, — F.3d —, No. 10 Civ. 512, 2011 WL 3625105, at *10 (2d Cir. Aug. 18, 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[37]     *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[38]     *Brod v. Omya, Inc.*, — F.3d —, No. 09 Civ. 4551, 2011 WL 2750916, at *7 (2d Cir. July 18, 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d

"'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[39] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[40]

## IV.   APPLICABLE LAW

### A.   "Claims" Under the Bankruptcy Code

A confirmation order pursuant to Chapter 11 of the Bankruptcy Code "discharges the debtor from any debt that arose before the date of such confirmation," subject to limited exceptions not at issue here.[41]  A "discharge under the [Bankruptcy] Code extinguishes a debtor's personal liability on his creditor's claims."[42]  The Bankruptcy Code defines "claim" as a

> (A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

---

123, 126 (2d Cir. 2004)).

[39]     *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[40]     *Brod*, 2011 WL 2750916, at *7 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

[41]     11 U.S.C. § 1141(d)(1)(A).

[42]     *Johnson v. Home State Bank*, 501 U.S. 78, 84 n.5 (1991).

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.[43]

## B.   Relevant Environmental Statutes

### 1.   New Mexico Water Quality Act

NMED seeks injunctive relief under the Water Quality Act.[44]  The Water Quality Act seeks to "abate and prevent water pollution,"[45] by authorizing the New Mexico Water Quality Control Commission (the "Commission") to "adopt water quality standards for surface and ground waters of the state."[46] Pursuant to this delegation, the Commission has regulated the quantity of VOCs permissible in groundwater.[47]

The Commission has also adopted regulations for the cleanup or abatement of water pollution to conform with drinking water standards.[48]  These

---

[43]    11 U.S.C. § 101(5).

[44]    *See* N.M. Stat. Ann. §§ 74-6-1 *et seq.*

[45]    *Bokum Res. Corp. v. New Mexico Water Quality Control Comm'n*, 93 N.M. 546, 555 (1979).

[46]    N.M. Stat. Ann. § 74-6-4(D).

[47]    *See, e.g.*, N.M. Code R. §§ 20.6.2.3103.A(19), (21), (31).

[48]    *See id.* §§ 20.6.2.4100 *et seq.*

regulations provide for a two-stage abatement plan.[49]  The NMED may require a Stage 1 abatement plan or a responsible party may submit it voluntarily, but once the plan is approved by NMED compliance is mandatory.[50]  Under a Stage 1 abatement plan, a responsible party will "design and conduct a site investigation that will adequately define site conditions, and provide the data necessary to select and design an effective abatement option."[51]  After the Stage 1 abatement plan is complete, a Stage 2 abatement plan is submitted, which serves "to select and design, if necessary, an abatement option that, when implemented, will result in attainment of the abatement standards."[52]  The Water Quality Act provides NMED authority to assess civil penalties or to seek an injunction:

> Whenever, on the basis of any information, [NMED] determines that a person violated or is violating a requirement, regulation or water quality standard adopted pursuant to the Water Quality Act . . . the [NMED] may: (1) issue a compliance order requiring compliance immediately or within a specified time period or issue a compliance order assessing a civil penalty, or both; or (2) commence a civil action in district court for appropriate relief, including injunctive relief.[53]

---

[49]   *See id.* §§ 20.6.2.4103(B), 20.6.2.4104(A), 20.6.2.4106(C), (E).

[50]   *See id.* §§ 20.6.2.4106(A), (B), 20.6.2.4110.

[51]   *Id.* § 20.6.2.4106(C).

[52]   *Id.* §§ 20.6.2.4101(D), 20.6.2.4106(E).

[53]   N.M. Stat. Ann. § 74-6-10(A).

### 2.   New Mexico Hazardous Waste Act

The New Mexico Hazardous Waste Act ("Hazardous Waste Act")
regulates the management and disposal of hazardous wastes.[54]  The Hazardous
Waste Act authorizes NMED to clean up a "hazardous substance incident" and
recover costs from the person responsible for the incident.[55]  A "hazardous
substance incident" is defined as "any emergency incident involving a chemical or
chemicals, including but not limited to transportation wrecks, accidental spills or
leaks, fires or explosions, which incident creates the reasonable probability of
injury to human health or property."[56]

### 3.   CERCLA

In 1980, Congress enacted the Comprehensive Environmental
Response, Compensation, and Liability Act ("CERCLA") "'to provide for liability,
compensation, cleanup, and emergency response to hazardous substances released
to the environment.'"[57]  CERCLA created a multi-billion dollar fund (the

---

[54]      *See id.* § 74-4-1 *et seq.*

[55]      *See id.* §§ 74-4-7(A), (C).

[56]      *Id.* § 74-4-3(J).

[57]      *In re Chateaugay Corp.*, 112 B.R. 513, 518 (S.D.N.Y. 1990) (quoting
*United States v. Reilley Tar & Chem. Corp.*, 546 F. Supp. 1100, 1111 (D. Minn.
1982)), *aff'd*, 944 F.2d 997 (2d Cir. 1991).

"Superfund") for the clean up of hazardous waste sites.  Pursuant to CERCLA, the EPA can take short term "removal" actions and long-term "remedial" actions in response to a release of hazardous substances.[58]  CERCLA also authorizes the EPA or a state to sue to recover "all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan."[59]  Any person who owned or operated the site at the time of the disposal of hazardous substances is liable under CERCLA.[60]

## C.    Environmental Injunctions under the Bankruptcy Code

At issue here is the extent to which an environmental cleanup obligation constitutes a "claim" – and is dischargeable – under section 101(5)(B) of the Bankruptcy Code.  The Supreme Court first addressed this issue in *Ohio v. Kovacs*.[61]  Kovacs violated a stipulation enjoining him from causing further pollution, bringing additional industrial wastes onto a site, and requiring him to remove wastes from the property.  As a result, Ohio appointed a receiver to take possession of all of Kovacs' assets and implement the cleanup.[62]  After Kovacs

---

[58]    *See* 42 U.S.C. §§ 9601(23), (24), 9604(a).

[59]    *Id.* § 9607(a)(4)(A).

[60]    *See id* § 9607(a)(1), (2).

[61]    469 U.S. 274 (1985).

[62]    *See id.* at 276.

-13-

filed for bankruptcy, Ohio sought a declaratory judgment that Kovacs' obligation to clean up was not dischargeable because it was not a "claim" under the Bankruptcy Code.[63]  The Court held that Ohio's right to an equitable remedy was a "claim" because "the only performance sought from Kovacs was the payment of money" and Kovacs was unable to comply with the injunction because the receiver was in control of the property.[64]

The Second Circuit further addressed the dischargeability of environmental injunctions in *In re Chateaugay Corporation*.[65]  The District Court held that, pursuant to section 101(5)(B), environmental injunctions based on a pre-petition release or threatened release would be dischargeable

> if the injunctive relief was an option the EPA was electing to use in lieu of incurring response costs itself and thereafter seeking reimbursement; on the other hand . . . "where there is no right to such payment for cleanup or other remedial costs, claims for injunctive relief do not fall within the Bankruptcy [Code] and are not dischargeable."[66]

The Second Circuit noted that this statement "obscures difficult questions of application because it is not clear which forms of injunctive relief [the District

---

[63]     *See id.* at 276-77.

[64]     *Id.* at 282-83.

[65]     944 F.2d 997 (2d Cir. 1991).

[66]     *Id.* at 1000 (quoting *Chateaugay*, 112 B.R. at 523).

Court] regards as being an option to EPA's right of response cost reimbursement and which entail 'no right to such payment.'"[67]  A broad test, in which any optional right of payment that EPA may choose not to exercise renders an injunction dischargeable, "would seem to render dischargeable all injunctive provisions for cleanup activity since EPA always has the option to incur response costs and seek reimbursement."[68]

The *Chateaugay* court attempted to clarify the distinction between environmental injunctions that are claims and those that are not:

> [Environmental] injunctions . . . frequently combine an obligation as to which the enforcing agency has an alternative right to payment with an obligation as to which no such alternative exists. An injunction that does no more than impose an obligation entirely as an alternative to a payment right is dischargeable. Thus, if EPA directs LTV to remove some wastes that are not currently causing pollution, and if EPA could have itself incurred the costs of removing such wastes and then sued LTV to recover the response costs, such an order is a "claim" under the [Bankruptcy] Code.  On the other hand, if the order, no matter how phrased, requires LTV to take any action that ends or ameliorates current pollution, such an order is not a "claim." . . .[69]

> Thus, a cleanup order that accomplishes the dual objectives of removing accumulated wastes and stopping or ameliorating ongoing pollution emanating from such wastes is not a

---

[67]   *Id.*

[68]   *Id.* at 1001.

[69]   *Id.* at 1008.

dischargeable claim. . . .[70]

But an order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a "claim" if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation. We recognize that most environmental injunctions will fall on the non-"claim" side of the line. . . .**[71]**

We recognize that in the context of environmental remedies the line between "claim" injunctions and non-"claim" injunctions could arguably be drawn somewhat differently, for example, by placing on the non-"claim" side only those injunctions ordering a defendant to stop current activities that add to pollution (*e.g.*, depositing new hazardous substances), while leaving on the "claim" side all other injunctions, including those that direct the cleanup of sites from which hazardous substances, previously deposited, are currently contributing to pollution. But we believe that placing on the non-"claim" side all injunctions that seek to remedy on-going pollution is more faithful to the Supreme Court's [precedents].[72]

Other Circuit courts have addressed environmental injunctions more analogous to the one at issue here. In *In re Torwico Electronics, Inc.*, the Third Circuit held that an environmental injunction was not a "claim" where a seepage

---

[70]     *Id.*

[71]     *Id.*

[72]     *Id.* at 1009.

pit continued to leak hazardous materials into the surrounding environment.[73]  The

court found Torwico's argument that it no longer owned the land unpersuasive –

"Torwico can . . . conduct the cleanup: it has access to the site and the state has not,

apparently, performed any cleanup of its own."[74]  The court also held that it was

irrelevant that the enforcing entity could have obtained a payment under a different

statutory provision.[75]

> In *United States v. Apex Oil Company*, the Seventh Circuit noted that

"[t]he sparsity of caselaw . . . together with the near consensus of the cases . . .

suggests a general understanding that discharge must indeed be limited to cases in

which the claim gives rise to a right to payment because the equitable decree

cannot be executed."[76]  In *Apex Oil*, the United States was proceeding under the

Resource Conservation and Recovery Act ("RCRA"), which does not entitle the

---

[73]    *See* 8 F.3d 146, 150 (3d Cir. 1993).

[74]    *Id.* at 151.

[75]    *See id.* at 151 n.6 ("The parties dispute whether if the state has an 'alternate payment remedy' the order becomes a 'claim.'  Here, it is undisputed that the order was issued under statutory sections which do not allow the state to perform the cleanup and then sue for reimbursement of its costs.  That authority may exist under other potentially relevant statutes for the state to perform the cleanup and seek reimbursement for its costs is irrelevant.").

[76]    579 F.3d 734, 738 (7th Cir. 2009), *cert. denied*, — U.S. —, 131 S. Ct. 67 (2010).

plaintiff to demand cleanup costs or any form of monetary relief.[77]  "Thus, the government's equitable claim . . . entitles the government only to require the defendant to clean up the contaminated site at the defendant's expense" and the obligation was not dischargeable.[78]

## V.    THE DECISION ON APPEAL

The Bankruptcy Court distilled a three-factor test from *Kovacs* and *Chateaugay* to determine when an environmental injunction is a claim.  *First*, the court considered whether "the debtor [is] capable of executing the equitable decree, or can he only comply by paying someone else to do it?"[79]  This factor was drawn from *Kovacs*, where Kovacs' inability to comply with the injunction and Ohio's request for only a monetary payment were determinative in holding the cleanup obligation dischargeable.[80]  *Second*, the court considered whether "the pollution [is] ongoing?"[81]  When pollution is ongoing, the debtor cannot pay money and continue to pollute – he must stop or abate the nuisance.[82]  *Third*, the court

---

[77]    *See id.* at 736.

[78]    *Id.* at 737.

[79]    *Mark IV*, 348 B.R. at 467.

[80]    *See id.  Accord Chateaugay*, 944 F.2d at 1008.

[81]    *Mark IV*, 348 B.R. at 468.

[82]    *See id.*

considered whether the enforcing agency has a right to payment in lieu of enforcing the injunction.  Specifically, "if the pollution is not ongoing, or if the order imposes discrete obligations to cleanup accumulated waste, does the environmental agency have the 'option' under the statute giving rise to the equitable obligation to remove the waste and seek reimbursement from the debtor?"[83]

Considering these factors, the Bankruptcy Court held that "Mark IV's environmental obligations are not dischargeable."[84]  *First*, the court noted that although Mark IV did not have possession of the Site, Mark IV had access to the Site for the purpose of complying with the NMED injunction.  Thus, *Kovacs* was not dispositive.[85]  *Second*, the court found that the issue of ongoing pollution could not be resolved on summary judgment because the parties' experts raised a factual issue.  However, the court found it unnecessary to determine whether there was

---

[83]      *Id.* (citing *Chateaugay*, 944 F.2d at 1008) ("[A]n order to clean up a site, to the extent that it imposes obligations distinct from any obligation to stop or ameliorate ongoing pollution, is a 'claim' if the creditor obtaining the order had the option, which CERCLA confers, to do the cleanup work itself and sue for response costs, thereby converting the injunction into a monetary obligation.").

[84]      *Id.* at 469.

[85]      *See id.*

ongoing pollution because the next factor was dispositive.[86] *Third*, NMED did not have the option to clean up the Site and seek reimbursement from Mark IV because NMED proceeded under the Water Quality Act, which does not authorize NMED to recover response costs.[87] The court rejected an argument that NMED could have proceeded under the Hazardous Waste Act or CERCLA and recovered response costs because "the focus is the statute under which [NMED] elected to proceed."[88] The court reasoned that Mark IV's argument that the court should look at any hypothetical right NMED might have to recover response costs "would result in the discharge of all environmental obligations" because

> the state or federal government will eventually have to step in and perform the cleanup to protect the public from a health hazard. At that point, the most that the governmental entity could do is seek reimbursement. Under Mark IV's theory, a government's ability to cleanup the hazard and seek reimbursement, whether under another statute or pursuant to its general police powers, would make the polluter's obligation to stop polluting a dischargeable "claim."[89]

Mark IV presents the following questions for appeal:

> 1. Did the Bankruptcy Court err in holding that an environmental

---

[86] *See id.*

[87] *See id.*

[88] *Id.* at 470.

[89] *Id.* at 471.

injunction issued under a statute that does not offer an alternative right of payment is not a dischargeable claim even where other applicable statutes provide an alternative right to payment to the governmental agency seeking the injunction?

2. Did the Bankruptcy Court err in applying the Second Circuit's decision in *United States v. LTV Corp.* (*In re Chateaugay Corp.*), 944 F.2d 997 (2d Cir. 1991) to a case involving property that was never part of the Debtors' estates when *Chateaugay* addressed a debtor's environmental obligations at property it owned and operated during its bankruptcy proceedings?

3. Did the Bankruptcy Court err in failing to rule that there is no "ongoing" pollution at property not owned or operated by the debtors and when the operations that caused the pollution ceased more than twenty years prior to the debtors' bankruptcy and the debtors removed all sources of the pollution approximately fifteen years prior to their bankruptcy?

4. Did the Bankruptcy Court commit legal error in ruling that the environmental injunction sought by NMED is not a dischargeable claim?[90]

## VI.   DISCUSSION

### A.   Source of Right to Payment

Mark IV argues that the Bankruptcy Court erred in holding that NMED's potential right to payment under the Hazardous Waste Act and CERCLA was irrelevant to whether NMED had a right to payment such that its injunction is a "claim" under the Bankruptcy Code.[91]  *First*, Mark IV contends that such a

---

[90]   Appellant Brief of Mark IV Industries, Inc. ("Mark IV Br.") at 1.

[91]   *See id.* at 8.

-21-

narrow interpretation of "claim" – looking only at the statute under which the enforcing agency is proceeding – is inconsistent with the plain meaning of the Bankruptcy Code.  *Second*, Mark IV argues that Second Circuit precedent requires courts to look at any right to payment an enforcing agency may have under any statutory authority.  *Third*, Mark IV argues that because NMED had a right to payment under the Hazardous Waste Act and CERCLA the Bankruptcy Court erred in holding that Mark IV's obligation to clean up the Site was not a "claim."

### 1.    Plain Meaning of "Claim" Under the Bankruptcy Code

Mark IV argues that the Bankruptcy Court's construction of "claim" – which only looks to the statute a government agency proceeds under – is inconsistent with the plain meaning of the Bankruptcy Code.[92]  Mark IV contends that where "the conduct that gives the creditor a right to an equitable remedy (i.e., the debtor's breach of performance) also 'gives rise to a right to payment,' the equitable remedy is dischargeable under the plain meaning of § 101(5)(B)."[93]  Thus, under Mark IV's reading of section 101(5)(B), courts should look at the debtor's conduct, not the source of law giving rise to an equitable remedy.[94]  Under

---

[92]    *See id.* at 9.

[93]    *Id.*

[94]    *See id.*

the reasoning advanced by Mark IV, its conduct – the breach of its obligation to clean up the Site – gives NMED a right to payment under the Hazardous Waste Act and CERCLA, such that the cleanup obligation is a "claim" dischargeable in bankruptcy.[95]

       The Bankruptcy Court's holding is not contrary to the plain meaning of section 101(5)(B). Merely reciting the section 101(5)(B) standard, as Mark IV essentially does, obscures "difficult questions of application" in the context of environmental injunctions.[96] Indeed, the Second Circuit has noted that it is not clear which environmental injunctions are "an option to EPA's right of response cost reimbursement and which entail 'no right to such payment.'"[97] The question is no simpler with respect to NMED, which may also carry out its mandate under a wide variety of statutes.

       The Bankruptcy Court correctly rejected Mark IV's oversimplified reading of section 101(5)(B) because such an interpretation could potentially render all environmental injunctions dischargeable – a result that contradicts

---

[95]    *See id.*

[96]    *Chateaugay*, 944 F.2d at 1000.

[97]    *Id.*

*Chateaugay*.[98]  Eventually the government has to step in and remedy an

environmental hazard "whether under another statute or pursuant to its general

police powers."[99]  According to Mark IV's plain-meaning interpretation, all such

environmental injunctions would be a "claim."  The Second Circuit has rejected

this result, observing that "most environmental injunctions will fall on the non-

'claim' side of the line."[100]  Because the plain language of section 101(5)(B) does

not squarely address the question of which environmental injunctions are "claims"

I must look closely at how courts have drawn the line between dischargeable and

nondischargeable environmental injunctions.

> ### 2.    "Claim" in the Context of Environmental Injunctions

Mark IV argues that the Bankruptcy Court erred in holding that the

availability of monetary relief under a separate statute is irrelevant because

*Chateaugay* rejected that argument.[101]  The Second Circuit test, according to Mark

IV, is that an environmental injunction is dischargeable if the enforcing agency had

any optional right to payment under any statutory authority.  To support this

---

[98]     *See Mark IV*, 438 B.R. at 471.

[99]     *Id.*

[100]     *Chateaugay*, 944 F.2d at 1008.

[101]     *See* Mark IV Br. at 10-14.

position, Mark IV points to language from *Chateaugay*, such as a statement that "injunctions sought as an option to EPA's (or a state's) right to incur and sue for response costs" are claims under the Bankruptcy Code.[102]  Based on this, and similar, excerpts from *Chateaugay*, Mark IV contends that any time an enforcing agency "has an option to conduct the cleanup and seek payment of its costs, an injunction ordering the debtor to implement the cleanup is a claim."[103]

NMED, EPA, and Chant respond that the Bankruptcy Court properly applied the relevant precedents by considering only the statutory authority that NMED actually invoked.  Appellees note that *Chateaugay* does not support Mark IV's argument because it did not involve an inquiry into an enforcing agency's right to monetary payment under an alternative statutory scheme.  In *Chateaugay*, the EPA was proceeding under CERCLA, under which the EPA "can either order the potentially responsible party to take the remedial action . . . or take the remedial action itself, using so-called Superfund money, and seek reimbursement for such response costs."[104]  When other courts have faced the issue raised here, they have held that environmental injunctions are not "claims" when the enforcing agencies

---

[102]    *Chateaugay*, 944 F.2d at 1008.

[103]    Mark IV Br. at 12.

[104]    *Chateaugay*, 944 F.2d at 1000.

-25-

proceeded under statutory authorities that did not provide for an alternative right to payment.[105]

Appellees further contend that, for pragmatic reasons, courts should not speculate about what alternative remedies an enforcing agency could theoretically have.[106] Environmental agencies have broad discretion as to how to carry out their responsibilities and the Bankruptcy Code "does not require creditors entitled to an equitable remedy to select a suboptimal remedy of money damages."[107]

*Chateaugay* did not squarely address the narrow question of whether a "right to payment" under section 101(5)(B) includes hypothetical remedies that the enforcing agency could have sought under other statutory authorities. *Chateaugay* only concerned an EPA injunction under CERCLA and EPA's right to payment under CERCLA. Thus, Mark IV's assertion that the Second Circuit has rejected appellees' argument is puzzling.

Mark IV's attempt to seize on carefully extracted quotes from

---

[105]    *See Apex Oil*, 579 F.3d at 736 (EPA proceeding under RCRA); *Torwico*, 8 F.3d at 151 n.6 (New Jersey proceeding pursuant to an administrative order).

[106]    *See* Brief of the Appellee NMED ("NMED Br.") at 12-13.

[107]    *Mark IV*, 438 B.R. at 470.

*Chateaugay* to reach its desired result is also unsuccessful.  For example, Mark IV relies on the passage stating that "injunctions sought as an option to EPA's (or a state's) right to incur and sue for response costs" are claims.[108]  Again, Mark IV's interpretation, that an optional right to conduct the cleanup and sue for response costs, begs the question – an optional right to cleanup and sue for response costs arising from which source of law?  An interpretation under which courts look to all sources of law would render most, if not all, environmental injunctions dischargeable.  This is inconsistent with *Chateaugay*, which drew the line between claims and non-claims closer to the non-claim side.[109]

To the extent that other courts have considered this issue, they have focused their inquiry on the statute under which the enforcing authority proceeded.  In *Torwico*, just as in this case, it was undisputed that the cleanup order "was issued under statutory sections which do not allow the state to perform the cleanup and then sue for reimbursement of its costs."[110]  Like the Bankruptcy Court, the Third Circuit disregarded "authority [that] may exist under other potentially relevant statutes for the state to perform the cleanup and seek reimbursement for its

---

[108]  *Chateaugay*, 994 F.2d at 1008.

[109]  *See id.* at 1009.

[110]  *Torwico*, 8 F.3d at 151 n.6.

-27-

costs."[111]

Similarly, the Seventh Circuit looked only to the statutory authority under which EPA was proceeding in considering whether an environmental injunction was dischargeable.  The court noted that the RCRA, like the Water Quality Act, "entitles the government only to require the defendant to clean up the contaminated site at the defendant's expense."[112]  Accordingly, the Seventh Circuit affirmed the lower court's ruling that the injunction was not a dischargeable claim.[113]  Mark IV fails to offer any convincing reason to distinguish *Apex* or *Torwico* from this case.

Mark IV relies on bankruptcy caselaw outside the environmental context to support its position.  For the reasons set forth by the Bankruptcy Court, I find this argument unpersuasive.[114]

Finally, to the extent that the Second Circuit has not decided this issue, policy considerations support looking only to the statutory authority under which an enforcing agency has chosen to proceed.  *First*, although Mark IV

---

[111]     *Id.*

[112]     *Apex*, 579 F.3d at 737.

[113]     *See id.* at 735-40.

[114]     *See Mark IV*, 438 B.R. at 470-71.

-28-

contends that the broad construction given to "claim" under the Bankruptcy Code supports its position, this principle is of limited value in the context of environmental injunctions, where the Second Circuit has already established a rule that renders most environmental injunctions nondischargeable.[115]  *Second*, courts generally respect the discretion of agencies to carry out their mandate as they see fit.[116]  Second-guessing an agency's choice of which authority to proceed under could often force an agency to accept a "suboptimal remedy," which is inconsistent with the requirements of the Bankruptcy Code.[117]

> *Chateaugay* does not conclusively resolve the issue under consideration here.  However, based on the Second Circuit's guidance in *Chateaugay*, the weight of persuasive authority, and pragmatic considerations, I hold that the proper test for determining whether an enforcing agency has a "right to payment" under section 101(5)(B) for an environmental injunction is to consider whether the enforcing agency has a right to cleanup and recover response costs under the statute pursuant to which the enforcing agency has obtained its

---

[115]    *See Chateaugay*, 944 F.2d at 1009.

[116]    *See Massachusetts v. EPA*, 549 U.S. 497, 527 (2007) ("[A]n agency has broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities.").

[117]    *See Mark IV*, 438 B.R. at 470.

injunction.

### 3.    NMED's Right to Payment Under the Hazardous Waste Act and CERCLA

Mark IV argues that the Bankruptcy Court erred in failing to find that NMED had a right to payment under the Hazardous Waste Act and CERCLA.[118] The Bankruptcy Court declined to determine whether NMED had a right to payment under either statute because it held that issue was irrelevant.[119]

Appellees argue that NMED does not have the option to receive an alternative monetary payment under the Hazardous Waste Act or CERCLA. *First*, they contend that the Hazardous Waste Act is inapplicable to the Site.  NMED's authority to spend money from the emergency fund is limited to an "emergency incident."[120]  Accordingly, NMED may not use the emergency fund for long-term groundwater remediation at the Site.  At most, the fund could be used to prevent an emergency, such as pollutants from the Site entering a drinking water well, but the expenditure would be limited to addressing that emergency only, not the long-term

---

[118]    *See* Mark IV Br. at 14-16.

[119]    *See Mark IV*, 438 B.R. at 470 ("Assuming without deciding that NMED could have proceeded under [the Hazardous Waste Act or CERCLA] instead of the Water Quality Act, the focus is the statute under which it elected to proceed.").

[120]    N.M. Stat. Ann. § 74-4-3(J).

cleanup of the Site.[121]  *Second*, appellees contend that CERCLA is inapplicable to the Site.  Federal regulations require that Superfund monies may only be used for remedial actions at sites listed in the National Priorities List ("NPL").[122]  The Site is not currently listed on the NPL, and NMED does not have authority to list the Site.[123]  Without a source of funding to clean up the Site, the ability to recover all costs of remedial action is useless.[124]

Although I need not reach this issue because NMED's lack of a right to payment under the Water Quality Act is dispositive, I note that appellees' arguments on this point miss the mark.  If the proper inquiry focused on a right to payment under any statutory authority, as Mark IV contends, the issue is whether NMED could recover the cost of the cleanup effort from Mark IV, not whether the enforcing agency is able to secure funding from the federal or state government to cleanup the Site.  Although CERCLA limits the availability of Superfund monies to sites on the NPL, the absence of the Site from the NPL does not bar an action by

---

[121]     *See* NMED Br. at 14-15.

[122]     *See* 40 C.F.R. § 333.425(b)(1) ("Only those releases included on the NPL shall be considered eligible for Fund-financed remedial action."); *Exxon Corp. v. Hunt*, 475 U.S. 355, 374 (1986) ("Remedial action will be financed only for sites on the National Priorities List.").

[123]     *See* Mar. Olson Aff. ¶¶ 28, 30.

[124]     *See* NMED Br. at 17.

NMED to recover the costs of a cleanup from Mark IV under CERCLA.[125]  If it were necessary to look beyond the Water Quality Act, NMED would have a right to payment under CERCLA[126] and the case would need to be remanded to the Bankruptcy Court to make a factual determination of whether there is ongoing pollution at the Site.[127]

### B.    Ongoing Pollution

Mark IV contends that the Bankruptcy Court erred in applying an "ongoing pollution" test as part of its inquiry into whether Mark IV's obligation to clean up the Site is dischargeable.  *First*, Mark IV argues that the Bankruptcy Court erred in considering "ongoing pollution" as a separate inquiry from whether NMED has a right to payment.  *Second*, Mark IV argues that, even if the ongoing pollution inquiry is appropriate, the undisputed facts establish that there is no ongoing pollution at the Site.

### 1.    Ongoing Pollution as a Ground for Nondischargeability of Environmental Injunctions as a Matter of Law

Mark IV argues that the Bankruptcy Court erred in its application of

---

[125]    *See New York v. Shore Realty Corp.*, 759 F.2d 1032, 1046 (2d Cir. 1985) ("[I]nclusion on the NPL is not a requirement for [a] State to recover its response costs.").

[126]    *See* 42 U.S.C. § 9607(a).

[127]    *See infra* Section VI.B.2.

*Chateaugay* by considering whether there is ongoing pollution.  Mark IV contends that under *Chateaugay* the right to payment is dispositive.

Appellees respond that an injunction addressed even in part to ongoing pollution is not dischargeable under *Chateaugay*.  Indeed, *Chateaugay* held that a cleanup order, which is addressed even in part to "stopping or ameliorating ongoing pollution emanating from [accumulated] wastes" is not dischargeable.[128]

The Bankruptcy Court did not err in applying an ongoing pollution test.  *Chateaugay* states that an injunction that is addressed, in any part, to ongoing pollution is not a "claim" under the Bankruptcy Code.[129]  While this principle is derived from the basic "right to payment" language in section 101(5)(B) – a polluter does not have the right to pay to continue to pollute[130] – this does not mean that the Bankruptcy Court erred in analyzing ongoing pollution as a separate inquiry from a statutory right to payment.  Because the line between a dischargeable and non-dischargeable environmental injunction is murky, the "ongoing pollution" test provides a helpful way, endorsed by the Second Circuit in

---

[128]     *Chateaugay*, 944 F.2d at 1008.

[129]     *See id.*

[130]     *See id.*

-33-

*Chateaugay*, to determine whether an injunction falls on the claim or non-claim side of the line.

Mark IV's argument that a right to payment is dispositive begs the question – how does the Court determine whether there is a right to payment in the context of environmental injunctions?  As discussed above, the court should determine whether the statute under which the enforcing agency is proceeding provides a right to cleanup and recover the costs.  However, even if such statutory authority exists, that is not the end of the inquiry under *Chateaugay*.  An environmental obligation to remedy ongoing pollution cannot be converted to a monetary sum.[131]  Therefore, even if the relevant statutory authority provides for recovery of cleanup costs, the court must examine whether the injunction is addressed to ongoing pollution such that it would be impermissible to convert the obligation into a monetary sum.  Indeed, this is the analysis used in *Chateaugay*.  Where the EPA pursues an injunction under CERCLA, it has a right to perform the cleanup and recover the costs.[132]  To the extent that the injunction is merely

---

[131]    *See id.* ("EPA is entitled to seek payment if it elects to incur cleanup costs itself, but it has no authority to accept a payment from a responsible party as an alternative to continued pollution.").

[132]    *See id.*

addressed at cleaning up the site, the EPA's injunction is a dischargeable claim.[133]

However, an injunction under CERCLA imposing an obligation to "stop or ameliorate ongoing pollution," is not dischargeable, despite a statutory right to recover cleanup costs, because the injunction is addressed in part at remedying ongoing pollution.[134]  Accordingly, the Bankruptcy Court did not err by considering ongoing pollution as a distinct inquiry under *Chateaugay*.

### 2.    Ongoing Pollution at the Site

Mark IV argues that even if there is an "ongoing pollution" inquiry, the Bankruptcy Court erred in not ruling, as a matter of law, that there is no ongoing pollution at the Site for two reasons – *Chateaugay* only applies to debtor-owned property and ongoing pollution does not include residual contamination.[135] The appellees contend that there is no basis for Mark IV's argument that ongoing pollution must be the result of current activities or operations at the Site. Appellees also argue that there is no basis for Mark IV's position that property ownership was the crucial factor in *Chateaugay*; a polluter has an obligation to clean up the property it polluted, whether or not it still owns the property.

---

[133]    *See id.*

[134]    *Id.*

[135]    Mark IV Br. at 20-24.

The appellees also contend that if the Court is to reach the issue of ongoing pollution, the undisputed evidence demonstrates that there is ongoing pollution at the Site – NMED seeks to enforce Mark IV's obligation under the abatement plan to stop VOCs from migrating at and beyond the Site.  In *Chateaugay*, the court gave a similar example as an illustration of ongoing pollution – "a toxic waste site from which hazardous substances are leaching into nearby water supplies."[136]  The Bankruptcy Court held that the issue of ongoing pollution at the Site was not ripe for summary judgment because of a factual dispute between expert witnesses.[137]

The Bankruptcy Court did not err in holding that a factual dispute precluded resolution of whether there is ongoing pollution at the Site.  *First*, Mark IV is incorrect in asserting that ownership of land is dispositive of whether there is ongoing pollution.  The *Torwico* court rejected this argument.[138]  Likewise, it has

---

[136]    *Chateaugay*, 944 F.2d at 1007.

[137]    *See Mark IV*, 438 B.R. at 469 ("NMED's expert has opined that the contaminants are migrating downgradient, suggesting that pollution is ongoing. Conversely, Mark IV's expert has concluded that the residual contamination at the Site does not pose a significant threat of migrating or endangering the downgradient water supply, suggesting there is no ongoing pollution or threat.  The Court cannot resolve this factual dispute in the context of the current cross-motions, but it is unnecessary to do so.").

[138]    *See Torwico*, 8 F.3d at 151 ("Torwico is a generator of hazardous waste and as such has an ongoing responsibility for the wastes it disposes.  Even

no basis under *Chateaugay*.  While there is language in *Chateaugay* that mentions

ownership of the polluted site, that is simply because ownership was the basis for

liability in that case.  Land ownership is not the only basis for environmental

liabilities.   Mark IV has a legal obligation to comply with the abatement plan.[139]

Because Mark IV has access to the Site it is able to comply with its legal

obligations, regardless of whether it owns the Site.

      *Second*, Mark IV's argument that ongoing pollution must be the result

of current activities or operations is contradicted by *Chateaugay*.  In drawing the

line between environmental injunctions that are claims and non-claims, the court

rejected a formulation that would classify injunctions "that direct the cleanup of

sites from which hazardous substances, previously deposited, are currently

contributing to pollution" as claims.[140]  Thus, "residual" waste, even if already

cleaned up, can cause "ongoing pollution" under *Chateaugay*.

      However, NMED has also failed to establish ongoing pollution as a

matter of law.  Although NMED has presented abundant evidence that VOCs are

migrating and threatening the water supply, Mark IV has also presented admissible

---

though Torwico no longer possesses the property, it is still, allegedly, Torwico's
wastes that are presenting a continuing environmental hazard.").

    [139]    *See* N.M. Code R. § 20.6.2.4110.

    [140]    *Chateaugay*, 944 F.2d at 1009.

expert evidence purporting to demonstrate that the pollution at the Site is contained.[141]  Such a dispute is not appropriate for resolution on summary judgment.  If it were necessary to reach this issue, the finder of fact would have to weigh the conflicting expert opinions.  While the Bankruptcy Court correctly noted that *Chateaugay* does not explain what exactly constitutes ongoing pollution,[142] I also need not reach that question in the context of this appeal.

## VII.   CONCLUSION

For the foregoing reasons, the decision of the Bankruptcy Court is AFFIRMED.  The Clerk of the Court is directed to close this appeal.

---

[141]     *See Mark IV*, 438 B.R. at 469.

[142]     *See id.*

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            September 28, 2011

**- Appearances -**

**For Plaintiff-Appellant:**

John P. Boyle, Esq.
J. Eric Ivester, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP (NYC)
Four Times Square
42nd Floor
New York, New York 10036
(212) 735-2527/3000

Don Joaquin Frost, Jr., Esq.
Elizabeth Ann Malone, Esq.
Skadden, Arps, Slate, Meagher & Flom LLP (DC)
1440 New York Avenue, NW
Washington, DC 20005
(202) 371-7422

**For Defendant-Appellee:**

Charles De Saillan
Assistant General Counsel
Special Assistant Attorney General
New Mexico Environment Department
Office of General Counsel
Post Office Box 5469
Santa Fe, New Mexico 87502
(505) 827-2985

**For Intervenor-Appellee Chant Family II Limited Partnership**

David T. Thuma, Esq.
Thuma & Walker, P.C.
500 Marquette NW Suite 650
Albuquerque, New Mexico 87102
(505) 766-9272

Edmund H. Kendricks, Esq.
Lara Katz, Esq.
Montgomery & Andrews, P.A.
Post Office Box 2307
Sante Fe, New Mexico 87504
(505) 982-3873

**For Intervenor-Appellee United States Environmental Protection Agency:**

Daniel P. Filor
Alicia M. Simmons
Assistant United States Attorneys
86 Chambers Street, Third Floor
New York, New York 10007
(212) 637-2697